UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

Bobby L. Warren, Jr.,

        Plaintiff,

  v.

Commissioner of Social Security,[1]

        Defendant.

**Decision and Order**

17-CV-13 HBS
(Consent)

---

## I. INTRODUCTION

The parties have consented to this Court's jurisdiction under 28 U.S.C. § 636(c). The Court has reviewed the Certified Administrative Record in this case (Dkt. No. 9, pages hereafter noted in brackets), and familiarity is presumed. This case comes before the Court on cross-motions for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure. (Dkt. Nos. 13, 16.) In short, plaintiff is challenging the final decision of the Commissioner of Social Security (the "Commissioner") that he was not entitled to Disability Insurance Benefits under Title II, or Supplemental Security Income under Title XVI, of the Social Security Act. The Court has deemed the motions submitted on papers under Rule 78(b).

## II. DISCUSSION

The ultimate issue to be determined by this Court is whether the ALJ's decision that plaintiff was not under a disability is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). Substantial evidence is defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support

---

[1] The Clerk of the Court is directed to conform the caption of the case to the caption of this decision.

a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

For purposes of Social Security disability insurance benefits, a person is disabled when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A).

Such a disability will be found to exist only if an individual's "physical or mental impairment or impairments are of such severity that [he or she] is not only unable to do [his or her] previous work but cannot, considering [his or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. §§ 423(d)(2)(A) & 1382c(a)(3)(B).

Plaintiff bears the initial burden of showing that her impairments prevent her from returning to her previous type of employment. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). Once this burden has been met, "the burden shifts to the [Commissioner] to prove the existence of alternative substantial gainful work which exists in the national economy and which the plaintiff could perform." *Id.*; *see also Dumas v. Schweiker*, 712 F.2d 1545, 1551 (2d Cir. 1983); *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980).

To determine whether any plaintiff is suffering from a disability, the ALJ must employ a five-step inquiry:

(1) whether the plaintiff is currently working;

(2) whether the plaintiff suffers from a severe impairment;

(3) whether the impairment is listed in Appendix 1 of the relevant regulations;

(4) whether the impairment prevents the plaintiff from continuing her past relevant work; and

(5) whether the impairment prevents the plaintiff from continuing her past relevant work; and whether the impairment prevents the plaintiff from doing any kind of work.

20 C.F.R. §§ 404.1520 & 416.920; *Berry*, *supra*, 675 F.2d at 467. If a plaintiff is found to be either disabled or not disabled at any step in this sequential inquiry, the ALJ's review ends. 20 C.F.R. §§ 404.1520(a) & 416.920(a); *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). However, the ALJ has an affirmative duty to develop the record. *Gold v. Secretary*, 463 F.2d 38, 43 (2d Cir. 1972).

To determine whether an admitted impairment prevents a plaintiff from performing her past work, the ALJ is required to review the plaintiff's residual functional capacity and the physical and mental demands of the work that she has done in the past. 20 C.F.R. §§ 404.1520(e) & 416.920(e). The ALJ must then determine the individual's ability to return to her past relevant work given her residual functional capacity. *Washington v. Shalala*, 37 F.3d 1437, 1442 (10th Cir. 1994).

Plaintiff argues that the Administrative Law Judge ("ALJ") who rendered an unfavorable decision improperly discounted a consultative examiner's opinion that his shortness of breath restricted him from even mild exertion. (Dkt. No. 16-1 at 18; Dkt. No. 18 at 1.) On February 21, 2014, plaintiff presented with shortness of breath and left ventricular hypertrophy, albeit also with an unremarkable chest x-ray and EKG. [376.] Plaintiff both denied and reported shortness of breath one month earlier. [404, 410.] Shortness of breath in late 2013 might have been connected more to anxiety than to a distinct physiological origin. [414, 417.] Plaintiff denied shortness of breath in July, October, and November 2013. [433, 437, 442.] Plaintiff did not report any shortness of breath in 2012. [453, 458, 463, 467, 479, 486.] Plaintiff's asthma appeared to be under control. [741, 743.] Against this record sits the internal medicine consultation of Dr. Michael Rosenberg

from September 9, 2014. [594.] After noting that plaintiff is a "poor historian," Dr. Rosenberg reported plaintiff's reports of daily wheezing from his asthma. [594.] Plaintiff apparently became short of breath by the end of the examination, but Dr. Rosenberg did not suggest why. [596.] Dr. Rosenberg thus offered no basis for the portion of his medical source statement that concluded that plaintiff's shortness of breath precluded any activity requiring mild or greater exertion. [598.] The record as a whole outweighs the medical source statement in any event. Under these circumstances, substantial evidence supported the ALJ's decision to give Dr. Rosenberg's opinion little weight.

Plaintiff argues that the ALJ failed to consider his finances when making note of his "sporadic treatment of his mental impairments." [32.] Plaintiff generally is correct that "the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." SSR 96-7p, 1996 SSR LEXIS 4, at *22 (Jul. 2, 1996); *see also, e.g., Newell v. Comm'r*, 347 F.3d 541, 547 (3d Cir. 2003); *L'Ouverture v. Comm'r*, No. 16 CIV. 1809 (HBP), 2017 WL 4157369, at *20 (S.D.N.Y. Sept. 18, 2017) (citations omitted). In this particular instance, though, the ALJ made no inferences. Plaintiff explained at his hearing that he had a specific, geographical reason for sporadic treatment that had nothing to do with finances:

> Q. All right. Now, I'm still trying to understand why you're coming to New York for medical care?
>
> A. Because I live in—New York is my home. That's where I—I mean, I'm hoping to come back here in the future, once I get—once I get everything situated. Right now, I'm not stable.
>
> Q. Well, don't you think that you need medical care in South Carolina?
>
> A. South Carolina is not my home. New York is my home. I'm just—

4

Q. I don't understand.

A. My home—my—my home is New York state. I'm just down there temporarily because I don't have nowhere to live. But once I—once I get situated, I'm—I'm going to reunite back into New York. I'm just down there temporarily, you know, because I want to get treatment but—

Q. Okay. But, let—I want to be clear about this.

A. Yes.

Q. For the last two years, have you spent most of your time in South Carolina, not in New York?

A. Well, back and forth, yes. Just going to my doctors and stuff like that.

Q. Okay. So, how often do you go to your doctors in New York?

A. Well, New York, whenever I got an appointment. I try to make it.

Q. So, how often is that?

A. Every—every, what, three or four months. I try to schedule like that.

Q. Okay.

A. So, I get my sister, I'm sorry.

Q. Do—do you get any medical care in between, for those three or four months between times when you come up here, do you get any kind of treatment in South Carolina?

A. No, no, no, no, no, no, no. I try—what I do, down there I just go, like, a—a rehab place. Well, not a rehab. Like AA meetings and stuff like that. Just to keep my mind, you know, from now drinking and stuff. I go to a lot of AA meetings.

[65–67.] This extended dialogue with the ALJ shows that plaintiff was capable of maintaining treatment schedules and diligent about doing so in New York. Plaintiff simply preferred not to pursue treatment whenever he stayed with relatives in South Carolina. Under these circumstances, substantial evidence supports the ALJ's discussion of interruptions in plaintiff's treatment.

5

Finally, plaintiff argues that the ALJ should have ordered IQ testing to explore the opinion from a consultative examiner that he had "borderline" cognitive functioning. The consultative psychiatric examination occurred on September 9, 2014 with the help of Ph.D. psychologist Rebecca Billings. Dr. Billings noted largely coherent thought processes but also noted impairments in attention, concentration, and memory skills. [602–03.] Dr. Billings further noted a "borderline range" of cognitive functioning and poor judgment. [604.] At the same time, however, Dr. Billings connected the deficits in cognitive functioning to the other issue, discussed above, of plaintiff's sporadic mental health treatment. "The difficulties are in my view caused by mental health symptoms that are in no form of treatment at this time." [605.] To the extent that the record reveals a work history and an ability to maintain attention and concentration [*E.g.*, 438–39, 520], improvements in plaintiff's cognitive functioning might coincide with periods of treatment. Additionally, as the Commissioner argues, no treatment provider ever suggested that IQ testing would help evaluate anxiety and mood disorders that appeared to be having the primary impact on plaintiff's cognitive functioning. In any event, IQ testing itself is akin to a laboratory result and not a medical opinion in itself. *See, e.g., Rivera v. Colvin*, No. 3:15-CV-01701 (VLB), 2017 WL 1005766, at *6 (D. Conn. Mar. 15, 2017) (citations omitted). Under these circumstances, substantial evidence supports the ALJ's assessment of plaintiff's cognitive functioning without the need for IQ testing.

## III. CONCLUSION

The Commissioner's final determination was supported by substantial evidence. For the above reasons and for the reasons stated in the Commissioner's briefing, the Court grants the Commissioner's motion (Dkt. No. 16) and denies plaintiff's cross-motion (Dkt. No. 13).

The Clerk of the Court is directed to close the case.

SO ORDERED.

                                                __/s Hugh B. Scott_____
                                                    Hon. Hugh B. Scott
                                                    United States Magistrate Judge

DATED: November 2, 2018